**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SUACER MARMOLEJOS-TEJEDA, a/k/a SUACER TEJEDA,<br><br>Plaintiff,<br><br>v.<br><br>AXSOME THERAPEUTICS, INC., MARK JACOBSON, MICHELLE GOTTLIEB, AND ERICA MIU,<br><br>Defendants. | **Case No. 1:26-cv-01953-JPC-GS**<br><br>**FIRST AMENDED COMPLAINT**<br><br>**AND DEMAND FOR JURY TRIAL** |

## I. NATURE OF THE CASE

**1.** This action arises from Axsome's retaliation against Plaintiff for internal disclosures concerning finance-related information-technology controls and for opposing accent-based national-origin discrimination, and from Axsome's disability discrimination, failure to accommodate, failure to engage in cooperative dialogue, and related retaliation.

**2.** Axsome recruited Plaintiff as Senior Manager, IT Operations to build a mature and scalable IT Operations function and thereafter promoted him to Associate Director, IT Operations based on his performance.

**3.** In performing that mandate, Plaintiff disclosed and objected to practices involving undocumented production changes, unreliable or incompletely attributable audit records, concentrated privileged access, inconsistent application of privileged-session controls, and accelerated changes to infrastructure supporting financial data. Plaintiff reasonably believed that those practices impaired Axsome's internal controls over financial reporting and violated or

circumvented applicable laws, rules, and regulations.

**4.** Separately, Plaintiff opposed repeated efforts to restrict a Black, Nigerian Support Engineer from orientations and other user-facing work because of his accent.

**5.** After Plaintiff renewed his governance objections in September and October 2024, Miu caused daily Support-management authority and strategic project ownership to be transferred away from Plaintiff, isolated him principally into technical execution, and reassigned to him infrastructure work that the announced succession plan had contemplated assigning to a subordinate. By January 2025, Miu was pursuing another manager for the Operations function, and on January 27 Ferreira informed Plaintiff that the planned early-2025 Director promotion had been withdrawn. Separately, after Plaintiff renewed his opposition to the accent-based restriction in December 2024, Miu continued targeted scrutiny of the Nigerian employee and further interfered with Plaintiff's personnel authority.

**6.** The resulting working conditions exacerbated Plaintiff's diagnosed anxiety disorder. On January 22, 2025, Plaintiff disclosed the disability-related effects and requested that Axsome enforce the existing reporting hierarchy by requiring Miu to communicate operational direction through Plaintiff's direct supervisor rather than bypassing that supervisor and directly controlling Plaintiff and his team. Human Resources and Plaintiff's supervisor then identified structural arrangements under which Plaintiff could remain employed.

**7.** Axsome did not resolve the accommodation request within the timeframe its leadership established for a restructuring recommendation. After Plaintiff tendered future-effective notice, he twice renewed the still-unresolved reporting-boundary accommodation while he remained employed. Ferreira reported that the January 30 request was routed through

Miu, that Miu presented it to Jacobson and vehemently opposed Plaintiff's continued employment, and that Jacobson made or approved the denial. The reasons communicated for that denial included Jacobson's discomfort with Plaintiff remaining at Axsome and the view that Plaintiff should work somewhere he had greater control.

**8.** While still employed, Plaintiff twice reported that Miu's participation in the decision was retaliatory and supplied documentary evidence of her knowledge and punitive reaction. Axsome did not interview Plaintiff about those retaliation reports, reopen the accommodation process, or reconsider the denial before ending his system access one day before the effective date of his notice. The resulting separation caused Plaintiff to forfeit unvested equity that Jacobson had represented as having a hypothetical projected value of approximately $880,000.

**9.** Plaintiff asserts whistleblower retaliation under N.Y. Labor Law § 740; disability discrimination and failure to accommodate under the ADA, NYSHRL, and NYCHRL; failure to engage in cooperative dialogue under the NYCHRL; disability retaliation under the ADA, NYSHRL, and NYCHRL; and retaliation for opposing national-origin discrimination under Title VII, the NYSHRL, and the NYCHRL.

## II. JURISDICTION AND VENUE

**10.** This Court has original jurisdiction under 28 U.S.C. § 1331 over Plaintiff's claims arising under Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act.

**11.** This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiff's related claims under N.Y. Labor Law § 740, the NYSHRL, and the NYCHRL because

those claims form part of the same case or controversy as Plaintiff's federal claims.

**12.** On September 5, 2025, Plaintiff timely filed a Charge of Discrimination with the EEOC. The Charge described Plaintiff's disability, accommodation, and disability-retaliation allegations and expressly identified the August 14 and December 10, 2024 attempts to restrict a Nigerian employee's user-facing work because of his accent, Plaintiff's opposition to that restriction, and the retaliation Plaintiff alleged followed. On December 8, 2025, the EEOC issued a Notice of Right to Sue. Plaintiff commenced this action within ninety days of receipt of that Notice.

**13.** On August 14, 2026, Plaintiff served a copy of the original Complaint upon the New York City Commission on Human Rights and the Corporation Counsel of the City of New York pursuant to N.Y.C. Administrative Code § 8-502(c). Plaintiff thereafter also provided each recipient with a copy of this First Amended Complaint.

**14.** Plaintiff has not directly filed a complaint concerning these claims with the New York State Division of Human Rights or the New York City Commission on Human Rights. Any referral arising from Plaintiff's federal EEOC filing does not constitute an election of remedies under N.Y.C. Administrative Code § 8-502(a).

**15.** Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred at Axsome's Manhattan headquarters and through decisions made or implemented there.

## III. THE PARTIES

**16.** **Plaintiff Suacer Tejeda** is an adult individual residing in Kings County, New

York. At all relevant times, Plaintiff was an employee within the meaning of Title VII, the ADA, the NYSHRL, the NYCHRL, and N.Y. Labor Law § 740. Axsome employed Plaintiff from January 2023 through February 7, 2025; Axsome ended his active system access on February 6, 2025.

**17.** **Defendant Axsome Therapeutics, Inc.** ("Axsome" or the "Company") is a Delaware corporation with its principal executive offices in Manhattan. At all relevant times, Axsome employed at least fifteen employees and was an employer within the meaning of Title VII, the ADA, the NYSHRL, the NYCHRL, and N.Y. Labor Law § 740.

**18.** **Defendant Mark Jacobson** is, and was at all relevant times, the Chief Operating Officer of Axsome Therapeutics. Jacobson possessed authority to make or influence final personnel decisions. He is sued individually only under the NYSHRL and NYCHRL counts alleging his own participation in retaliation or discrimination and, where applicable, aiding and abetting a violation by Axsome.

**19.** **Defendant Michelle Gottlieb** was Axsome's Vice President of Human Resources. Gottlieb personally received Plaintiff's disability-related complaint, discussed a structural reporting alternative with him, and participated in the accommodation process described below. Immediately before Jacobson's January 27, 2025 meeting with Plaintiff, Plaintiff observed Gottlieb provide Jacobson with the equity-valuation sheet used during that meeting. Gottlieb is sued individually only under Count V based on her own alleged participation in the cooperative-dialogue process.

**20.** **Defendant Erica Miu** was Axsome's Executive Director of Information Technology and Plaintiff's skip-level manager. Miu exercised authority over Plaintiff's

assignments, projects, staffing, reporting structure, and continued employment and personally participated in the acts alleged below. Miu is sued individually under the identified NYSHRL and NYCHRL counts based on her own alleged discrimination or retaliation and, where specifically pleaded, her aiding and abetting of Axsome's violation.

**21.** **Dieter Ferreira** was Axsome's Senior Director of IT and Plaintiff's direct supervisor. Ferreira possessed authority to direct Plaintiff's work, assign responsibilities, evaluate performance, communicate management decisions, escalate compliance concerns, and recommend corrective personnel or organizational action. Ferreira is not named as a defendant and is a material witness to the events alleged below.

## IV. FACTUAL BACKGROUND

### A. Axsome Recruits Plaintiff to Build a Scalable IT Operations Function

**22.** On October 26, 2022, Plaintiff provided Axsome's recruiter with the résumé used to evaluate his candidacy and thereafter interviewed with Jacobson, Gottlieb, Miu, Ferreira, Axsome's Chief Financial Officer, and other personnel responsible for the position. During that process, Axsome's leadership repeatedly identified rapid headcount growth as a significant operational concern, and Jacobson told Plaintiff that Axsome had approximately doubled in size each year and needed an operating model capable of supporting continued growth.

**23.** In late November 2022, after hearing the challenges identified during the interview cycle, Plaintiff presented a slideshow titled "The Road to a Scalable End-User Support Experience." The presentation treated onboarding, identity lifecycle management, hardware and software lifecycle management, employee support, and offboarding as interdependent

components of a scalable Operations function and proposed automation, controlled access workflows, automated equipment enrollment, policy-enforced device management, and self-service resources.

**24.** The résumé Axsome received documented more than ten years of information-technology experience and more than five years leading technical projects and end-user support teams, including direct management of a multilevel global support organization serving more than 1,000 employees. It also documented Plaintiff's prior deployment of an automated identity-and-access-management platform with internal Cybersecurity and Audit personnel that supported Sarbanes-Oxley compliance, his work with Risk and Audit, and his development of formal incident- and change-management workflows.

**25.** Axsome hired Plaintiff with the elevated title Senior Manager, IT Operations. Its written Job Description assigned him responsibility to lead daily IT Operations, establish and improve operational processes, direct internal support, gather requirements, implement technical solutions, oversee engineering functions, maintain security architecture and monitoring, administer identity systems, introduce workflow automation, and escalate issues. The interview mandate, presentation, résumé, and Job Description were consistent: Axsome recruited Plaintiff to exercise independent operational judgment and build a mature, scalable, increasingly automated Operations function.

## B. Plaintiff Delivers Results but Is Denied the Authority of His Written Role

**26.** Between February and April 2023, Plaintiff successfully led the technical portion of Axsome's relocation to the World Trade Center. He thereafter completed Axsome's

cloud-based automated equipment-enrollment configuration, enabling Axsome to prepare devices through its own management platform rather than continue paying its managed-services provider for a substantially automated imaging process.

**27.** When management declined to authorize the complete identity-lifecycle integration Plaintiff had proposed, he developed a controlled method to create and update employee accounts in bulk through the identity provider's application-programming interface. These improvements reduced repetitive work, lowered provider dependence, and increased Axsome's ability to support larger onboarding groups. In August 2023, Axsome promoted Plaintiff to Associate Director, IT Operations based on his performance.

**28.** Despite those results, management did not provide Plaintiff the access, authority, or managerial latitude necessary to perform substantial portions of the role for which he had been recruited.

**29.** From approximately April through September 2023, Plaintiff also led remediation of approximately 700 mobile devices affected by a certificate error predating his employment. Ferreira controlled the schedule and sometimes placed multiple two-hour employee sessions on Plaintiff's calendar without meaningful notice. Plaintiff reported that the repeated sessions were psychologically draining and causing burnout, and Miu supported his request that Ferreira reduce the burden.

**30.** On February 9, 2024, Plaintiff formally reported in his upward review that Ferreira struggled to delegate, took back assigned work, bypassed Plaintiff, overcommitted employees, and repeatedly changed agreed directions. Plaintiff explained that the conduct conveyed distrust, prevented effective use of his team, and was not a sustainable leadership

model.

**31.** Ferreira later complained that the review had "sidelined" him. In Ferreira's March 2024 review of Plaintiff, Ferreira characterized Plaintiff's management style as "too harsh" and requiring continued monitoring. Plaintiff responded that he had not been allowed to exercise meaningful managerial authority and again objected to Ferreira directly assigning work to Plaintiff's subordinates.

**32.** On June 26 and 27, 2024, Plaintiff again objected after Ferreira stated that he wanted to treat Plaintiff and his subordinates as operational equals whom Ferreira could direct himself. Plaintiff documented that little work remained subject to his independent judgment and stated that this would be his final attempt to obtain a durable correction.

**33.** Human Resources reviewed the submission and identified Plaintiff to Miu as a potential flight risk.

### C. Plaintiff Identifies and Discloses Finance-Related Governance Deficiencies

**34.** Around May 2024, Miu instructed Plaintiff to consult Axsome's outside systems-engineering contractor concerning migration of the financial file repository to a cloud-hosted environment. After evaluating the project, the contractor declined the work because it considered the migration too risky given the sensitivity of the financial and other business data involved.

**35.** Management then provided Plaintiff direct access to the existing environment and assigned him technical responsibility for the migration. Plaintiff determined that a responsible migration required staged transfer, file-integrity validation, preservation of access permissions,

and replication and testing of backup and monitoring controls before the new repository could replace the existing one. He communicated those requirements to Ferreira and Miu and objected to accelerated schedules that omitted them.

**36.** On June 7, 2024, Axsome's external auditor requested evidence that critical servers housing financial data were receiving required updates. Ferreira responded that the managed infrastructure provider was responsible and that, because Axsome paid for a managed service, the Company did not need to worry about whether the updates were performed. Ferreira did not identify internal verification or an attributable change record confirming completion.

**37.** During the same response, Plaintiff told Miu that Axsome needed formal Change Management over upgrades and other material changes. Miu stated that she was glad Plaintiff understood the "change management piece" and recognized that he had performed that work before.

**38.** Plaintiff explained that Axsome should create an attributable record for each material change so that later review could identify what changed, when and why it changed, who performed it, and under whose authorization. He further explained that outsourcing the technical work did not itself create an adequate internal record.

**39.** On June 14, while assisting Ferreira with another external-audit request, Plaintiff identified that Axsome's auditor-facing monitoring platform referenced an obsolete directory server rather than the source containing current access activity for the on-premises financial repository.

**40.** On June 18, Plaintiff and Ferreira spent several hours troubleshooting the platform's host server. Plaintiff determined that the platform was outdated and unreliable, and the

vendor advised Miu that the installed version was too old for the ordinary upgrade path and required a new installation.

**41.** Plaintiff also discovered that the platform's automated monitoring functions operated under Miu's personal privileged identity rather than a neutral service identity. Because Miu used the same identity for interactive administrative work, automated platform activity and Miu's human activity appeared under one identity, impairing independent attribution.

**42.** Plaintiff objected to Ferreira that the automated platform should use a dedicated service identity. Ferreira responded that Miu had rejected that configuration and deliberately retained her personal identity. Ferreira ultimately approved a dedicated service identity for the rebuilt system, and Axsome implemented the correction in late June 2024.

**43.** In or around June or July 2024, at Miu's direction, Plaintiff also implemented a privileged-access-management platform for servers supporting the financial repository and related infrastructure. The platform generated attributable session logs and replayable recordings of covered administrative activity.

**44.** Miu represented that the platform was intended principally for outside infrastructure contractors. To Plaintiff's knowledge, the contractor for whom Miu said it was intended did not use it, while Plaintiff and the employees reporting through him did.

**45.** Plaintiff told Ferreira that everyone accessing the covered environment should use the same process. Miu and Ferreira nevertheless retained direct privileged credentials and, apart from limited testing, continued accessing the environment outside the platform. During a recorded training session in Plaintiff's notice period, Miu stated that she had never used it.

**46.** Plaintiff disclosed to Ferreira that the inconsistent application of the platform

created detailed, replayable records of his team's privileged work while comparable activity by Miu and Ferreira lacked the same record, impairing the completeness and reliability of the privileged-access history over finance-related infrastructure.

**D. Human Resources Intervention, Express Trust, and the Director Succession Plan**

**47.** During early 2024, Miu repeatedly advocated internalizing Axsome's Helpdesk and equipment-depot functions while Ferreira resisted or delayed that objective. Plaintiff advised Miu that the functions could be internalized and that he had prior experience building and operating similar capabilities.

**48.** In a separate June communication, Miu told Plaintiff that he had "earned [her] trust already" and that she did not "need to worry." She immediately asked whether his virtual-desktop pilot was ready, and Plaintiff stated that it could begin at any time.

**49.** After Human Resources identified Plaintiff as a potential flight risk, Miu invited him to dinner on July 8. Plaintiff told Miu that Ferreira's micromanagement was taxing, that the lack of trust was disorienting, and that the management structure prevented him from performing as effectively as he could. Plaintiff did not request less responsibility; he asked for sufficient operational space to perform more of his assigned role.

**50.** Miu acknowledged that Ferreira hoarded work, including work he could not complete efficiently, and stated that responsibilities might need to be divided differently. Ferreira thereafter told Plaintiff that he would step back from daily control of Plaintiff's team and materially did so, improving their working relationship.

**51.** Ferreira simultaneously warned that his withdrawal would expose Plaintiff more

directly to Miu and explained that he had previously attempted to serve as a buffer between Miu and the Operations team.

**52.** On July 31, Ferreira told Plaintiff that the contemplated organizational structure would place Plaintiff in charge of Operations, promote him to Director of IT Operations in early 2025, and add an infrastructure employee beneath him to assume much of the daily backend-engineering work. Because Ferreira had begun stepping back, the plan was credible, but it depended on Miu respecting the existing hierarchy rather than directly controlling Plaintiff and his team.

**E. Plaintiff Opposes Accent-Based Restrictions on a Nigerian Subordinate**

**53.** Beginning in approximately 2023, a Black, Nigerian Support Engineer regularly and capably conducted Axsome's new-hire IT orientations and other user-facing support sessions.

**54.** Ferreira nevertheless repeatedly asked Plaintiff to replace the employee during orientations, particularly larger sessions, and referred to the employee's accent or an asserted difficulty understanding him. Plaintiff opposed removing him, explaining that the employee was capable and that new hires should become familiar with the Support Engineer who would later assist them.

**55.** On August 14, 2024, Miu expressly stated in Plaintiff's presence that she did not want the Nigerian employee conducting user-facing meetings because of his accent.

**56.** Plaintiff did not impose the categorical accent-based restriction and continued assigning the employee user-facing work subject to ordinary availability and operational needs. Miu knew that the employee continued performing those functions under Plaintiff's management.

**F. Miu Begins Directly Challenging Plaintiff's Operational Judgment**

**57.** During the second half of 2024, Plaintiff continued encountering material production changes performed without a defined Change Management procedure, attributable approval record, documented assessment of risk and effect, or reliable notice to the employees responsible for supporting the affected systems.

**58.** On September 11, Miu removed two Operations employees' ordinary administrative access to the enterprise email system because they could view executive email metadata and directed Plaintiff to implement just-in-time elevation that notified her whenever either employee activated permissions needed for assigned work. Plaintiff objected that comprehensive logging and auditability—not denying required access based on distrust—were the appropriate accountability controls.

**59.** On September 16, Ferreira advised Plaintiff that the office expansion was then expected to require occupancy in approximately mid-December. The unsettled move remained a substantial planning variable because the Operations team would have to immediately suspend or defer other work once the scope and date became final.

**60.** On September 18, Miu separately made delivery of a new virtual-desktop proof of concept before January a departmental priority.

**61.** During a September 18 one-on-one, Ferreira first proposed transferring daily Helpdesk work from Plaintiff to the Senior IT Operations Engineer, stating that Plaintiff appeared overextended. Plaintiff responded that he had not requested removal of those duties, remained capable of performing them, and instead required rational sequencing and additional permanent headcount. Plaintiff further explained that internalizing Helpdesk required Change Management,

approval procedures, documentation, automation, and other operational processes rather than merely redirecting tickets.

**62.** On September 20, Miu contacted Plaintiff after a managed-services-provider invoice appeared to show a fifty-seven-ticket monthly overage. The Operations team promptly identified the figure as a billing error. The provider corrected the invoice and confirmed that Axsome was more than thirty tickets below its contractual allowance.

**63.** Miu had not previously supplied Plaintiff with the Helpdesk metric, support-demand baseline, priority-and-impact matrix, or performance standard she was treating as expected. Plaintiff explained that reducing repetitive tickets required the documentation, automation, self-service resources, service definitions, and request-management processes his team was developing.

**64.** On September 26, Miu directed Plaintiff to develop proofs of concept for two competing, functionally similar virtual-desktop platforms by year end so that she could "play with" both and decide which to retain. Plaintiff explained the largely duplicative architecture, configuration, testing, and implementation work and offered to deliver whichever platform she selected by the end of November.

**65.** Miu rejected that proposal, removed the evaluations from Plaintiff's immediate control, and consulted outside contractors. The contractors' schedules extended beyond Miu's preferred timetable and corroborated Plaintiff's assessment that both systems could not responsibly be developed concurrently within the remaining three months of 2024.

**G. Miu Uses Subjective Criticism and a Corrected Billing Error to Question Plaintiff's**

**Authority**

**66.** During the October 1 weekly meeting, Plaintiff, Ferreira, and Miu agreed that Axsome would complete internalization of Helpdesk by August 2025, when the existing managed-services relationship was scheduled to end.

**67.** At approximately 1:47 p.m. on October 2, the Senior IT Operations Engineer observed messages between Miu and Ferreira appear in the department-wide messaging channel and then disappear. The engineer immediately reported that they had been discussing Plaintiff's management of Helpdesk and whether those duties should instead be transferred to him. Plaintiff had seen message notifications but relies on the engineer's contemporaneous account for the substance of the exchange.

**68.** The engineer reported words to the effect of: "Unless [the engineer] wants to step up," and, "Suaz seems to know how to run a helpdesk but do we really want him doing that." Plaintiff and the engineer immediately discussed that Miu's concern appeared to arise from the supposed ticket overage even though the provider had already corrected the invoice and confirmed that Axsome remained below its allowance.

**69.** Later that afternoon, Miu directly questioned why Plaintiff was not already devoting additional time to Helpdesk and stated that, if Plaintiff and his team were not motivated, Axsome should not proceed. Miu expressly framed her assessment as: "Thats the feeling that i am getting."

**70.** Plaintiff immediately rejected that characterization and explained that the team remained committed to the agreed August 2025 delivery. He further explained that responsible internalization required foundational Change Management, Incident Management, service

definitions, documentation, automation, and related dependencies rather than merely creating a ticket portal.

**71.** Plaintiff identified the other initiatives Miu was simultaneously requiring the team to perform, including the two virtual-desktop evaluations, the financial-repository migration, decommissioning of the managed server environment, cost-reduction work, security hardening, and preparation for the office expansion.

**72.** When Plaintiff explained that the office move had recently reentered active planning, Miu responded, "dont give me that." Plaintiff reminded her that she had accepted the August 2025 deadline and asked that she either provide sufficient time and operational space or authorize additional permanent personnel.

**73.** Miu did not identify an agreed deadline Plaintiff had missed, a previously requested metric he had failed to provide, a deliverable he had refused to complete, or another objective performance deficiency supporting the motivation accusation.

## H. The October Roadmap Override Becomes a Functional Demotion

**74.** On October 3, Plaintiff complained to Ferreira that Miu's repeated changes in direction prevented the team from maintaining a coherent roadmap and disregarded sequencing decisions she had previously accepted. Ferreira agreed that he had been attempting to shield the team from Miu's "behavior and whiplash" and characterized the experience as "welcome to my world."

**75.** By October 10, the two recent matters Miu had used to question Plaintiff's operational judgment had not produced an objective deficiency: the contractors had corroborated

his virtual-desktop assessment, and the provider had corrected the invoice showing that Axsome had remained below its ticket allowance.

**76.** On October 10, at Miu's request, Plaintiff presented Miu and Ferreira with a written Support Program Roadmap identifying the current work, dependencies, sequencing, and resource requirements for internalizing Helpdesk.

**77.** The roadmap explained that a Service Catalog would inventory the systems and services Operations managed, their costs, uptime, service levels, dependencies, approval structures, management responsibilities, and associated tasks. It identified the catalog as supporting IT Support, Infrastructure Change Management, cost management, and dependency management and showed account-lifecycle automation, knowledge-base development, and device-lifecycle management as already in progress.

**78.** The roadmap also explained how automation, self-service, and virtual desktops could reduce support staffing over time but estimated that Axsome's existing population otherwise required at least four dedicated Level 1 and Level 2 Support employees.

**79.** Miu rejected Plaintiff's proposed sequencing, asked why Axsome could not copy the existing provider's ticketing configuration, and stated that she could complete the Service Catalog herself within an hour. Plaintiff provided the template; Miu did not complete it.

**80.** Plaintiff asked Miu to define project requirements and success criteria before assigning future projects. Following the meeting, Ferreira directed Plaintiff to implement a minimum-viable configuration copied substantially from the provider's existing system and defer the fuller Service Catalog and governance structure.

**81.** That same week, Miu requested direct access to Plaintiff's project board because

she did not understand why he could not move faster and wanted to organize his work herself.

**82.** By mid-October, the proposal initially described as workload relief had expanded into a broader restructuring. Ferreira informed Plaintiff that Miu wanted the Senior IT Operations Engineer to assume daily Support operations while Plaintiff would be restricted principally to infrastructure implementation.

**83.** The same restructuring transferred primary ownership of the office expansion upward to Ferreira. Ferreira thereafter planned and delivered the move without Plaintiff's ordinary participation and consulted him only when discrete technical gaps required his specialized knowledge.

**84.** Ferreira showed Plaintiff an organizational chart in which Plaintiff appeared without employees reporting beneath him, while Ferreira's responsibilities remained substantially unchanged.

**85.** Plaintiff had not requested an infrastructure-only role, and neither Miu nor Ferreira identified an agreed deadline that Plaintiff or his team had missed as the basis for the restructuring.

**86.** After removing Plaintiff's daily Support-management authority, Miu personally reassigned Azure Virtual Desktop to him when the contractors she had consulted could not satisfy her preferred timetable. The reassignment restored none of his managerial authority and required him to perform the architecture, configuration, scripting, testing, and implementation.

**87.** The resulting structure inverted the July plan. Rather than promote Plaintiff to Director and place an infrastructure employee beneath him, Axsome removed Plaintiff's Operations-management portfolio and left him performing substantially the individual-contributor

infrastructure work contemplated for that subordinate.

**88.** Miu also continued pressing Plaintiff to complete the financial-repository migration, while Plaintiff maintained that the replacement could not go live until data integrity, permissions, backups, and monitoring had been validated. By the end of November, the virtual-desktop environment Plaintiff designed had reached a functional proof-of-concept stage suitable for stakeholder demonstration.

## I. Axsome Preserves Plaintiff's Formal Title While Withholding Actual Authority

**89.** After daily Support management was transferred to the Senior IT Operations Engineer, Axsome planned to hire an additional Support employee who would operationally work under that engineer. On November 27, Ferreira told Plaintiff that Human Resources would not permit the candidate to report formally to the engineer because he lacked a management-level title, so Axsome planned to list the candidate under Plaintiff and change the reporting line after the engineer's anticipated promotion.

**90.** That nominal assignment did not restore Plaintiff's practical staffing or Support-management authority. By December 10, Plaintiff documented that he was "technically" hiring the candidate but could not determine the position's reporting structure, responsibilities, relationship to Support, or whether his own team was understaffed.

**91.** On December 10, Miu and Ferreira again questioned whether the Nigerian Support Engineer should conduct orientations and other user-facing sessions because of his accent or delivery. Plaintiff again opposed removing the employee and stated that he would not strip the employee's principal developed responsibility based on the accent concern.

**92.** On December 11, Ferreira further told Plaintiff that Miu believed the Nigerian employee did not perform enough work and repeatedly required Ferreira to demonstrate what the employee was doing. Plaintiff was not aware that Miu imposed the same recurring demand concerning the other Operations employees.

**93.** Ferreira also told Plaintiff that Miu did not trust anyone on the Operations team to deliver and wanted outside contractors used to accelerate Plaintiff's projects. That demand followed the September episode in which Miu removed the virtual-desktop evaluations from Plaintiff and received contractor estimates corroborating his assessment.

**94.** Miu's demand was not tied to a missed deadline, formal warning, or documented deficiency. Plaintiff told Ferreira that contractors would not correct shifting requirements, unstable priorities, or lost internal continuity and that permanent staffing was the appropriate means of increasing capacity. Miu's reported distrust also contrasted with her June trust statement and with the work nearing completion.

**95.** On December 13, Miu arranged a meeting concerning virtual-desktop documentation without inviting Ferreira and assigned the Senior IT Operations Engineer to prepare the documentation directly, although Plaintiff remained the platform's architect and technical lead.

**96.** On December 20, Ferreira questioned why the team had accelerated its internal equipment-depot work before the previously communicated first-quarter target. Plaintiff explained that Miu's repeated demands for immediate, tangible Helpdesk progress had created that pressure. Ferreira accepted that the pressure was real and relayed Miu's statement: "If people don't want to be micromanaged then they need to make things work and happen."

**97.** On January 2, 2025, Plaintiff's team successfully deployed the virtual-desktop platform to approximately fifty incoming Sales employees and operated the internal equipment depot for the same hiring cycle ahead of the previously communicated schedule.

**98.** On January 6, Plaintiff rated his 2024 performance "Exceptional," and Ferreira stated that he intended to assign the same rating. In the separate upward-review portion routed to Miu, Plaintiff formally reported that Miu prevented Ferreira from leading independently and perpetuated a culture of distrust.

**99.** Also on January 6, Ferreira told Plaintiff that Miu objected to the referred Support candidate because she believed he had discussed cybersecurity too frequently. No interviewer identified a technical deficiency, unwillingness to perform Support work, or other objective disqualification, but Ferreira stated that management was preparing to reject the candidate based on Miu's objection.

**100.** On or around January 7, Ferreira informed Plaintiff that Miu was interviewing a former colleague for a leadership position above the Operations function. Plaintiff had previously participated in departmental interviews but was excluded from that process even though the contemplated employee would exercise authority over the function Plaintiff had been told he would lead.

**101.** On January 9, Plaintiff reported to Axsome's Senior Manager of Talent Acquisition that Miu and Ferreira were treating the candidate's hiring "on autopilot" and excluding Plaintiff from decisions concerning his own team.

**102.** On January 10, the Talent Acquisition manager stated that the candidate's interest in future cybersecurity development was not disqualifying, that he understood the Support role,

and that the direct manager ordinarily should make the ultimate decision. She characterized Miu's and Ferreira's level of intervention as unusual. The process continued, but Plaintiff's broader staffing and reporting-line authority was not restored.

### J. Plaintiff Discloses His Disability and Requests a Reporting-Boundary Accommodation

**103.** Plaintiff has been diagnosed with an anxiety disorder for which he received ongoing medical treatment and prescribed medication before January 2025. When materially exacerbated, the condition can impair his concentration, clear thinking, and performance of ordinary daily functions, although Plaintiff remained able to perform the essential functions of his position.

**104.** In late 2024, after Plaintiff reported increasing workplace-related anxiety, his treating physician independently proposed doubling his medication dosage. Plaintiff declined an immediate increase because he hoped the conditions would improve and agreed with his physician to monitor the deterioration and revisit treatment if it continued.

**105.** On January 21, 2025, Plaintiff received an unexpected written offer for an IT Director position at another biotechnology company. On January 22, he informed Ferreira of the offer and stated that he was considering whether to leave Axsome.

**106.** Plaintiff explained that compensation was not the reason. He told Ferreira that Miu's escalating micromanagement, demeaning treatment, disregard of the hierarchy, and repeated disruption of agreed plans were materially exacerbating his diagnosed anxiety.

**107.** Plaintiff explained that Miu's direct and unpredictable intervention had become a

disability-related workplace barrier. He remained able and willing to perform his position if operational direction followed the existing hierarchy through Ferreira and requested that Miu be required to communicate through Ferreira rather than bypassing him and directly controlling Plaintiff and his team.

**108.** The request did not seek reduced hours, reduced workload, removal of an essential function, a promotion, or termination of Miu's employment. It sought enforcement of the existing reporting boundary so Plaintiff could continue performing his full role.

**109.** When Plaintiff stated that Miu needed to be "out of the Operations picture," he meant that she should no longer bypass or directly control the Operations reporting chain. He did not request removal of Miu from her separate Data responsibilities or termination of her employment.

**110.** During the same discussion, Plaintiff renewed his concern that Miu's intervention posed a serious risk to Axsome's technology environment and identified examples involving concentrated access, undocumented changes, the auditor-facing monitoring environment, and the financial repository.

**111.** Ferreira escalated Plaintiff's complaint to Gottlieb and Jacobson and told Plaintiff that he strongly wanted to retain him. Ferreira further reported that Jacobson considered Plaintiff and the team valuable, asked whether additional resources would help, and instructed Ferreira and Human Resources to develop a restructuring recommendation within one or two business days and no later than January 27.

**112.** Ferreira told Jacobson that additional resources alone would not correct Miu's conduct and that her disrespect and lack of trust had to be addressed before Axsome lost Plaintiff

or other team members.

**113.** On January 23, Plaintiff met with Gottlieb, described his limitations and requested accommodation, and explained the deterioration caused by Miu. Gottlieb asked whether Plaintiff would accept an arrangement in which Ferreira led Operations and Miu remained outside that reporting structure. Plaintiff accepted the proposal.

**114.** Ferreira separately proposed that Plaintiff lead Operations and Infrastructure while Ferreira moved into other functions and assisted as needed. Plaintiff remained open to either concept so long as Miu could no longer bypass the Operations reporting chain.

**115.** No participant told Plaintiff that the requested boundary or either alternative was infeasible, prevented performance of an essential function, or imposed an undue hardship. Axsome did not issue a written final determination identifying an accommodation granted or denied.

**116.** After the January 23 meeting, Jacobson personally approached Plaintiff at his desk, acknowledged the pending accommodation request, and offered to discuss it directly. Plaintiff agreed. Jacobson thereafter assumed direct handling of the request, and Plaintiff had no further accommodation dialogue with Gottlieb before the January 27 meeting or before tendering notice.

## K. Jacobson Does Not Resolve the Structural Inquiry Before Plaintiff Gives Notice

**117.** Plaintiff's meeting with Jacobson was postponed twice and ultimately occurred late in the day on January 27, 2025.

**118.** Minutes before the meeting, Plaintiff observed Gottlieb briefly meet with

Jacobson and hand him a sheet showing hypothetical future values of Plaintiff's already-issued stock options.

**119.** Jacobson began by asking about Plaintiff's challenges. Plaintiff explained that Miu's conduct was exacerbating his anxiety and recreating a prior work environment in which managerial mistreatment had seriously affected his health. Plaintiff stated that materially increasing anxiety from management conduct was a serious medical warning sign.

**120.** Jacobson characterized the disclosure as Plaintiff feeling "miserable" at Axsome and remarked upon the optics of a mental-health-focused company not taking an employee's mental health seriously.

**121.** Jacobson called Miu a taskmaster and said her management approach was something he could address. He did not discuss Plaintiff's reporting-boundary request, Gottlieb's proposal, Ferreira's proposal, their feasibility, or another effective accommodation.

**122.** Instead, Jacobson told Plaintiff to allow the existing review process to proceed and showed him a projection that his already-issued stock options might eventually be worth approximately $880,000.

**123.** The projection was not new compensation, an additional equity grant, or an accommodation. After the meeting, Ferreira told Plaintiff that Jacobson believed the discussion had gone well. Plaintiff responded that no structural or disability-related solution had been offered, and Ferreira reiterated that he had told Jacobson and Human Resources that the issue was not compensation.

**124.** Ferreira also reduced Jacobson's earlier open-ended resource inquiry to another contractor proposal, telling Plaintiff in substance: "Mark wants to give you more resources. We

need to get you a contractor." Plaintiff had already explained that contractor labor would not address Miu's direct intervention, the reporting-boundary barrier, lost internal continuity, or the need for permanent staffing and operational authority.

**125.** Neither Gottlieb nor another Human Resources representative returned to Gottlieb's proposed structure, discussed its feasibility or alternatives with Plaintiff, or provided a written determination.

**126.** Plaintiff then asked about the announced Director succession plan. Ferreira informed him that the planned early-2025 promotion had been withdrawn and was no longer under consideration; at most, it might be revisited no earlier than approximately August 2025.

**127.** After the accommodation process produced no reporting boundary and Plaintiff learned that the planned promotion had been withdrawn, Plaintiff concluded that Axsome was leaving the disability-exacerbating reporting structure unchanged and that no viable internal path remained. He therefore tendered notice that evening, effective February 7, 2025.

**128.** Plaintiff formally executed the outside offer only after verbally informing Ferreira of his intent to resign and transmitting his resignation email to Axsome.

**129.** Ferreira responded in an email copied to Miu, Jacobson, and Gottlieb, describing Plaintiff as an "essential part of our maturation" and a "pivotal member in every key project" the Operations, Infrastructure, and Security team had launched.

## L. Miu Gains Actual Knowledge and Participates in the Renewed Request

**130.** On January 28, Miu contacted Plaintiff through his personal WhatsApp account and stated that Human Resources had not told her what had occurred. Ferreira had told Miu that

morning that she was the reason Plaintiff was leaving but that Human Resources had instructed him not to disclose the underlying complaint details. Miu nevertheless contacted Plaintiff to obtain the "backstory."

**131.** During the resulting call, Plaintiff told Miu that he had complained to Ferreira, Gottlieb, and Jacobson and expressly stated that her micromanagement, demeaning treatment, and disregard of the reporting hierarchy were causing him anxiety and were material reasons for his resignation.

**132.** Miu did not acknowledge the disability-related disclosure. She blamed Human Resources for failing to retain Plaintiff and asked whether she and Plaintiff remained friends.

**133.** Later that evening, Ferreira told Plaintiff that Miu had said she hoped Plaintiff was learning a "lesson" from the events.

**134.** By the conclusion of January 28, Miu had actual notice that Plaintiff had complained to Human Resources and the COO, that he attributed disability-related harm to her conduct, and that the complaint was a material cause of his notice.

**135.** On January 29, Ferreira informed Plaintiff that Human Resources was expanding its review of Miu's conduct to additional employees. The investigation did not resolve Plaintiff's accommodation request or cause Human Resources to resume the dialogue with him while he remained employed.

**136.** On January 30, while still employed, Plaintiff renewed the unresolved accommodation request and sought to keep the process open by telling Ferreira that he would withdraw his resignation and remain if Axsome enforced a narrower boundary under which Ferreira acted as the buffer between Miu and Operations. A separate compensation component

responded to Jacobson's prior compensation inquiry, but Plaintiff continued identifying the reporting boundary as necessary.

**137.** Ferreira told Plaintiff that the request had to be routed through Miu. Plaintiff objected to placing the request through the subject of his complaint, but Ferreira stated that he was required to follow that procedure.

**138.** According to Ferreira, he emailed the request to Miu, Miu brought it to Jacobson, and Miu then communicated the decision back to Ferreira.

**139.** On January 31, Ferreira informed Plaintiff that the request had been denied. Ferreira relayed that Axsome was going in a different direction, would not refill Plaintiff's management role, and wanted a more technical resource. He also attributed to Jacobson the statements that Jacobson was uncomfortable knowing Plaintiff did not feel comfortable at Axsome and that Plaintiff should work somewhere he had greater control.

**140.** Axsome did not ask how the narrower boundary would operate, whether it would permit Plaintiff to remain, or whether another boundary would address his limitations. It did not issue a written accommodation determination.

**141.** That evening, while still employed, Plaintiff again renewed the unresolved accommodation request directly with Jacobson via email and asked to remain under his existing title and conditions if Axsome meaningfully addressed Miu's conduct. Plaintiff emphasized that he did not need the outside position or a change in compensation and would remain if he received a credible assurance that the disability-related reporting barrier would be addressed.

**142.** Jacobson did not respond, reopen the accommodation dialogue, or provide a written decision.

**M. Plaintiff Reports Retaliation, Axsome Ends His Access Early, and Axsome Later Implements a Comparable Boundary**

**143.** On February 3, Ferreira told Plaintiff that Ferreira and Jacobson had wanted Plaintiff to remain but that Miu had "vehemently opposed" his continued employment.

**144.** Plaintiff immediately stated in writing that he believed Miu's opposition was retaliation and identified her off-system contact, knowledge of the complaint, and reported "lesson" statement to support his belief. Ferreira responded "of course" to the disclosure but also said that he did not believe reporting it would make a difference.

**145.** On February 5, during his formal exit interview, Plaintiff made a second retaliation report to Human Resources. He supplied screenshots documenting Miu's WhatsApp contact and the "lesson" statement and identified the conflict created by allowing the subject of his complaint to participate in evaluating or communicating his request to remain.

**146.** No Human Resources representative thereafter interviewed Plaintiff about the retaliation allegation, sought additional evidence from him, advised him that an investigation had begun, insulated him from further retaliation, or reconsidered the denial while he remained employed.

**147.** On February 6, one day before the effective date of Plaintiff's notice, Axsome informed him that the day would be his final active workday and ended his access to Company systems.

**148.** On February 13, Ferreira told Plaintiff that Human Resources and Jacobson had confronted Miu concerning the reported management issues and instructed her not to communicate directly with employees outside her immediate reporting structure.

**149.** The restriction described by Ferreira was materially similar to the accommodation Plaintiff had requested: Miu would communicate through the managers between her and the Operations employees rather than bypassing them and directly controlling the team.

**150.** Axsome therefore implemented a comparable hierarchy-based boundary for the employees who remained shortly after declining to meaningfully evaluate or provide that boundary to Plaintiff.

**N. Axsome's Post-Separation Conduct Contradicts the January 31 Explanation**

**151.** On March 6, 2025, Ferreira told Plaintiff that he was "struggling to find Suaz 2.0." When Plaintiff responded that Axsome could have retained "1.0," Ferreira agreed and stated that the decision had been "made above" him.

**152.** Effective July 2025, Axsome promoted the Senior IT Operations Engineer who had assumed daily Support management to Associate Director, IT Operations—the same title Plaintiff held when Axsome stated that it would not refill his management role.

**153.** Axsome also promoted Ferreira to Executive Director. On August 15, Ferreira told Plaintiff that Miu credited him with the promotion because he had "implemented her vision," referring to the virtual-desktop project Plaintiff had architected and delivered.

**154.** When Plaintiff observed that the underlying work had been delivered by Ferreira's team despite unrealistic demands, Ferreira responded, "I owe you, man," and characterized Miu as wanting "obedience not creativity."

**155.** The search for "Suaz 2.0," later use of Plaintiff's Associate Director title for the employee who absorbed his Support functions, and promotion rationale tied to implementation of

Miu's AVD "vision" contradicted the January 31 explanation that Axsome was eliminating Plaintiff's management role and wanted only a technical resource.

## V. CAUSES OF ACTION

### <u>COUNT I</u>

### WHISTLEBLOWER RETALIATION

### Violation of the New York Labor Law § 740

### Against Defendant Axsome Therapeutics, Inc.

**156.** Plaintiff repeats and incorporates only ¶¶ 22–52, 57–90, 93–98, 100, 110–112, 126, and 151–155 as if fully set forth herein. Plaintiff does not incorporate allegations relevant solely to his disability or national-origin-opposition claims.

**157.** At all relevant times, Axsome was an employer and Plaintiff was an employee within the meaning of N.Y. Labor Law § 740.

**158.** Axsome is a publicly traded issuer subject to federal requirements concerning the establishment and maintenance of internal accounting controls and the assessment and reporting of internal control over financial reporting, including 15 U.S.C. §§ 78m(b)(2)(B) and 7262 and applicable Securities and Exchange Commission regulations.

**159.** Based on his training, prior audit experience, and enterprise-technology experience, Plaintiff reasonably believed that Axsome practices affecting finance-related infrastructure violated or circumvented those requirements by impairing independent attribution, segregation of duties, change authorization, non-repudiation, and the reliability and completeness

of audit trails.

**160.** Plaintiff disclosed, objected to, or refused to participate in particular employer practices including:

- **a.** relying on a managed infrastructure provider for critical-server updating without maintaining sufficient internal verification and attributable records after an external auditor requested evidence of those updates;
- **b.** continuing to use an outdated and unreliable auditor-facing monitoring platform that referenced an obsolete data source;
- **c.** operating the platform's automated monitoring functions under Miu's personal privileged identity, thereby commingling automated activity with her interactive human activity;
- **d.** selectively requiring Plaintiff and his team to use recorded privileged-access sessions while Miu and Ferreira used direct credentials outside the same control;
- **e.** permitting material production changes without a consistent attributable record identifying the change, responsible actor, authorization, purpose, risk, and effect;
- **f.** restricting ordinary operational access while resisting the comprehensive logging and auditability controls Plaintiff advocated as the appropriate accountability mechanism; and
- **g.** pressuring Plaintiff to migrate the financial repository without completing staged transfer, integrity validation, preservation of access permissions,

and replication and testing of backup and monitoring controls.

**161.** Plaintiff made those disclosures and objections directly to supervisors with authority to direct his work or take corrective action, including Ferreira and Miu. On January 22, 2025, Plaintiff renewed the governance concerns to Ferreira, who escalated the matter to Gottlieb and Jacobson.

**162.** Plaintiff explained the actual practices at issue and the control deficiencies they created. He was not required during each workplace communication to identify the precise statute or regulation implicated.

**163.** Miu initially acknowledged Plaintiff's Change Management experience, accepted the need for attributable change records, and stated that Plaintiff had earned her trust.

**164.** The disputed controls shared a common feature: dedicated service identities, attributable change records, uniform privileged-session monitoring, and defined governance would have constrained unilateral activity and made it independently reviewable. Miu instead retained or bypassed direct credentials, imposed selective monitoring on Plaintiff's team, rejected the governance sequence Plaintiff presented, and sought direct control of his project board. Those facts support an inference that Plaintiff's compliance-oriented objections threatened Miu's preferred personal control over the environment and that she prioritized preserving that control over implementing the neutral controls Plaintiff reasonably believed necessary to satisfy Axsome's applicable internal-control obligations.

**165.** Beginning in September 2024, after Plaintiff's independent judgment constrained Miu's preferred timing, sequencing, and access model, Miu rejected his proposed delivery sequence, removed work from him, and sought outside contractors whose timing assessments

corroborated Plaintiff. In October, Plaintiff renewed his Change Management and Incident Management objections, Miu responded with subjective accusations concerning motivation, and management directed a reduced minimum-viable implementation that deferred the fuller governance work.

**166.** In close temporal proximity, Axsome subjected Plaintiff to retaliatory actions affecting the terms, conditions, and privileges of his employment, including:

**a.** transferring daily Support-management authority to an employee reporting through Plaintiff;

**b.** transferring strategic ownership of the office expansion upward to Ferreira;

**c.** removing Plaintiff's direct reports, practical hiring authority, delegation authority, and broader operational jurisdiction;

**d.** subjecting Plaintiff to direct task-level intervention and project-board surveillance;

**e.** isolating Plaintiff principally into technical infrastructure execution while retaining the projects that depended on his specialized expertise; and

**f.** displacing the announced Director succession plan by pursuing another manager for the Operations function; and

**g.** communicating on January 27, 2025 that the planned early-2025 Director promotion had been withdrawn.

**167.** A causal connection is supported by Miu's direct knowledge; the close timing; the correspondence between the authority Plaintiff exercised to make the disclosures and the authority

removed from him; the use of contractors after Plaintiff's judgment constrained Miu; the contractors' validation of Plaintiff; the corrected billing error; Miu's reliance on subjective "feelings" rather than identified deficiencies; and Plaintiff's subsequent successful delivery and highest-available performance rating.

**168.** The January 27 withdrawal followed Plaintiff's January 22 renewal of the governance concerns and their escalation to Human Resources and Jacobson. At that time, Plaintiff had successfully delivered the accelerated virtual-desktop and equipment-depot work, Ferreira intended to assign him the highest performance rating, and Axsome had identified no objective performance deficiency warranting withdrawal of the announced promotion.

**169.** Axsome is responsible for the actions of Miu, Ferreira, and the management representatives who participated in, implemented, or ratified the retaliatory restructuring and withdrawal of the succession plan.

**170.** Axsome's retaliatory actions were taken because of Plaintiff's protected disclosures and objections and were not predicated on grounds independent of his exercise of rights under § 740.

**171.** As a direct and proximate result, Plaintiff suffered loss of managerial authority, professional advancement, compensation and benefits associated with the announced Director position, and other economic injury, and is entitled to the relief authorized by N.Y. Labor Law § 740.

## COUNT II

## DISABILITY DISCRIMINATION, FAILURE TO ACCOMMODATE, DENIAL OF CONTINUED EMPLOYMENT, AND, IN THE ALTERNATIVE, CONSTRUCTIVE DISCHARGE

### Americans with Disabilities Act, 42 U.S.C. § 12112

### Against Defendant Axsome Therapeutics, Inc.

**172.** Plaintiff repeats and incorporates only ¶¶ 26–33, 47–52, 57–90, 93–100, and 103–155.

**173.** Plaintiff has a diagnosed anxiety disorder that, when materially exacerbated, substantially limits his concentration, clear thinking, and performance of ordinary daily functions.

**174.** Plaintiff was otherwise qualified and remained able to perform the essential functions of his position, as demonstrated by his successful project delivery and Ferreira's intended highest-available performance rating.

**175.** On January 22, 2025, Plaintiff informed Ferreira that Miu's direct, unpredictable, and demeaning intervention was materially exacerbating his condition.

**176.** Plaintiff requested a reporting-boundary accommodation requiring Miu to communicate operational direction through Ferreira rather than bypassing Ferreira and directly controlling Plaintiff and his team.

**177.** The request did not seek reduced hours, reduced workload, removal of an essential function, a promotion, or termination of Miu's employment.

**178.** The requested boundary was reasonable on its face because it sought enforcement of the existing hierarchy, Ferreira had already served as a successful buffer, and Plaintiff remained able and willing to perform his full role under that structure.

**179.** Human Resources proposed an arrangement in which Ferreira led Operations outside Miu's reporting structure. Ferreira separately proposed that Plaintiff lead Operations and Infrastructure while Ferreira moved into other functions.

**180.** Plaintiff accepted or remained open to those structural alternatives. No participant advised him that the boundary was infeasible, prevented performance of an essential function, or imposed an undue hardship.

**181.** Jacobson assumed direct control of the accommodation process, personally acknowledged the pending request at Plaintiff's desk, and met with Plaintiff on January 27.

**182.** Jacobson did not evaluate the reporting-boundary request or the alternatives proposed by Gottlieb and Ferreira. He instead characterized Plaintiff's disability-related distress as feeling "miserable," discussed the existing performance-review process, and presented a hypothetical valuation of already-issued options.

**183.** Contractor labor did not address the workplace barrier Plaintiff identified and was not an effective substitute for the requested reporting boundary.

**184.** While still employed, Plaintiff used his January 30 and January 31 communications to renew the unresolved accommodation request and keep the accommodation process open under a narrower reporting boundary. Those requests were expressly conditioned on correction of the disability-related barrier and did not express willingness to remain under unchanged conditions.

**185.** Axsome did not ask how the narrower boundary would work, assess its feasibility, propose an effective alternative, or determine that it imposed an undue hardship.

**186.** Instead, Axsome denied Plaintiff's request to remain employed. Reasons

communicated for the denial included Jacobson's discomfort knowing Plaintiff felt uncomfortable at Axsome and the view that Plaintiff should work somewhere he had greater control.

**187.** Axsome thereby failed to accommodate Plaintiff's known limitations and denied him the opportunity to continue his employment because continued employment would require an accommodation. Alternatively, if Axsome attributes the separation solely to Plaintiff's January 27 notice, Axsome constructively discharged him by knowingly leaving the disability-exacerbating reporting structure and functional demotion unremedied after workable structural alternatives had been identified and by withdrawing the announced advancement path, making continued employment under unchanged conditions objectively intolerable to a reasonable person in Plaintiff's position. Plaintiff pleads constructive discharge solely as an alternative separation theory under this Count.

**188.** As a direct and proximate result, Plaintiff suffered lost compensation, lost equity and benefits, emotional distress, and other economic and noneconomic injury.

## COUNT III

### DISABILITY DISCRIMINATION, FAILURE TO ACCOMMODATE, AND, IN THE ALTERNATIVE, CONSTRUCTIVE DISCHARGE
### Violation of N.Y. Executive Law § 296

### Against Defendants Axsome Therapeutics, Inc., Erica Miu, and Mark Jacobson

**189.** Plaintiff repeats and incorporates only ¶¶ 26–33, 47–52, 57–90, 93–100, and 103–155.

**190.** Plaintiff was a person with a disability within the meaning of the NYSHRL, was qualified for his position, and could perform its essential functions with the requested reporting

boundary.

**191.** Axsome knew of Plaintiff's disability, limitations, and requested accommodation no later than January 22, 2025.

**192.** Axsome failed to provide a reasonable accommodation, failed to establish undue hardship, and denied Plaintiff the opportunity to continue his employment under a reasonable reporting boundary. Alternatively, if Axsome attributes the separation solely to Plaintiff's January 27 notice, Axsome constructively discharged him by knowingly leaving the disability-exacerbating reporting structure and functional demotion unremedied after workable structural alternatives had been identified and by withdrawing the announced advancement path, making continued employment under unchanged conditions objectively intolerable to a reasonable person in Plaintiff's position. Plaintiff's later offers to remain were conditioned on correction of those conditions.

**193.** Miu learned that her conduct was exacerbating Plaintiff's disability, participated in routing and presenting the renewed request, communicated the result downward, and vehemently opposed Plaintiff's continued employment.

**194.** Jacobson assumed control of the accommodation process, did not meaningfully evaluate the requested boundary or proposed alternatives, and made or approved the denial.

**195.** Through those affirmative acts, Miu and Jacobson directly participated in and aided and abetted Axsome's disability discrimination and failure to accommodate.

**196.** As a direct and proximate result, Plaintiff suffered economic and noneconomic damages.

## COUNT IV

### DISABILITY DISCRIMINATION, FAILURE TO ACCOMMODATE, AND, IN THE ALTERNATIVE, CONSTRUCTIVE DISCHARGE
### Violation of N.Y.C. Administrative Code § 8-107

### Against Defendants Axsome Therapeutics, Inc., Erica Miu, and Mark Jacobson

**197.** Plaintiff repeats and incorporates only ¶¶ 26–33, 47–52, 57–90, 93–100, and 103–155.

**198.** Plaintiff had an actual mental or psychological impairment within the NYCHRL's broad definition of disability.

**199.** Axsome, Miu, and Jacobson knew or should have known of that disability and the accommodation required.

**200.** Plaintiff could satisfy the essential requisites of his position with the requested reporting boundary.

**201.** Axsome failed to provide a reasonable accommodation and denied Plaintiff continued employment under circumstances in which the need for accommodation played a role in the decision. Alternatively, if Axsome attributes the separation solely to Plaintiff's January 27 notice, Axsome constructively discharged him by knowingly leaving the disability-exacerbating reporting structure and functional demotion unremedied after workable structural alternatives had been identified and by withdrawing the announced advancement path, making continued employment under unchanged conditions objectively intolerable to a reasonable person in Plaintiff's position. Plaintiff's later conditional efforts to remain did not concede that unchanged conditions were tolerable.

**202.** Miu personally participated by acquiring knowledge of the disability complaint,

expressing a punitive reaction, interposing herself in the renewed request, and vehemently opposing Plaintiff remaining.

**203.** Jacobson personally participated by assuming control of the process, minimizing the disability-related disclosure, failing to evaluate the structural alternatives, and making or approving the denial.

**204.** Miu and Jacobson are liable for their own participation and, where applicable, for aiding and abetting Axsome's violation.

**205.** Plaintiff was treated less well because of his disability and need for accommodation.

**206.** Plaintiff suffered economic and noneconomic injury as a direct and proximate result.

## COUNT V

### FAILURE TO ENGAGE IN COOPERATIVE DIALOGUE

### Violation of N.Y.C. Administrative Code § 8-107(28)

### Against Axsome Therapeutics, Inc., Michelle Gottlieb, and Mark Jacobson

**207.** Plaintiff repeats and incorporates only ¶¶ 103–142.

**208.** On January 22, 2025, Plaintiff requested a disability-related reporting-boundary accommodation and explained the limitation and workplace barrier requiring it.

**209.** On January 23, Gottlieb personally discussed Plaintiff's accommodation needs and proposed an arrangement under which Ferreira led Operations outside Miu's reporting structure.

**210.** Plaintiff accepted that concept. Ferreira separately proposed another potentially effective structure.

**211.** No participant identified a difficulty, essential-function conflict, or undue hardship posed by either structure.

**212.** After January 23, Plaintiff had no further accommodation dialogue with Gottlieb. Immediately before Jacobson's January 27 meeting with Plaintiff, Gottlieb provided Jacobson with the equity-valuation sheet used during that meeting.

**213.** Jacobson personally acknowledged the pending request at Plaintiff's desk and assumed direct handling of it.

**214.** During the January 27 meeting, Jacobson did not discuss the requested boundary, Gottlieb's proposal, Ferreira's proposal, feasibility, possible alternatives, or undue hardship.

**215.** While still employed, Plaintiff renewed the unresolved reporting-boundary request on January 30 and again directly with Jacobson on January 31. Both communications were intended to keep the accommodation process open and to identify the conditions under which Plaintiff could remain employed.

**216.** Whether treated as continuations of the original, still-unconcluded dialogue or as new requests for a narrower accommodation, the January 30 and January 31 communications required Axsome to continue or begin a cooperative dialogue. Axsome and Jacobson did neither.

**217.** Axsome never provided Plaintiff with a written final determination identifying any accommodation granted or denied.

**218.** Axsome is liable as the covered employer. Gottlieb is sued based on her personal participation in the original dialogue, her proposal of a potentially effective structure, and the

absence of any further dialogue with Plaintiff before the process concluded. Jacobson is sued based on his assumption of the process, failure to address the proposed structures, and failure to engage concerning the renewed requests.

**219.** As a direct and proximate result, Plaintiff suffered economic and noneconomic injury.

## <u>COUNT VI</u>

## DISABILITY RETALIATION

### Americans with Disabilities Act, 42 U.S.C. § 12203

### Against Axsome Therapeutics, Inc.

**220.** Plaintiff repeats and incorporates only ¶¶ 103–155.

**221.** Plaintiff engaged in protected activity by requesting accommodation on January 22; complaining directly to Miu on January 28 that her conduct exacerbated his disability; renewing the accommodation request on January 30 and January 31; and making two separate reports of suspected retaliation on February 3 and February 5.

**222.** Axsome had actual knowledge of each protected activity through the representative to whom it was directed or communicated, including Ferreira, Gottlieb, Miu, Jacobson, and Human Resources.

**223.** After learning of Plaintiff's disability complaint, Miu stated that she hoped Plaintiff was learning a "lesson."

**224.** Miu then participated in the process concerning whether Plaintiff could remain employed and vehemently opposed his continued employment.

**225.** Axsome denied Plaintiff's January 30 and January 31 requests, did not reconsider

the denial after receiving the two retaliation reports, and ended Plaintiff's active system access on February 6, one day before the effective date of his notice.

**226.** The February 3 and February 5 reports were separate protected activities. They are not alleged to have caused the earlier January 31 denial; rather, each placed Axsome on notice of the allegedly retaliatory decision and preceded Axsome's continued refusal to reconsider and the February 6 lockout.

**227.** By leaving the challenged denial in place after receiving those reports and proceeding with the early lockout, Axsome adopted or ratified the result.

**228.** The close timing, Miu's stated reaction, her conflicted participation, Axsome's failure to reconsider, the early lockout, the later imposition of a similar reporting boundary, and the post-separation contradictions to the stated rationale support a causal inference.

**229.** But for Plaintiff's exercise of rights protected by the ADA, Axsome would not have subjected him to the challenged retaliatory actions.

**230.** Plaintiff suffered economic and noneconomic damages as a direct and proximate result.

## COUNT VII

### DISABILITY RETALIATION

### Violation of N.Y. Executive Law § 296(7)

### Against Defendants Axsome Therapeutics, Inc., Erica Miu, and Mark Jacobson

**231.** Plaintiff repeats and incorporates only ¶¶ 103–155.

**232.** Plaintiff engaged in protected activity by requesting reasonable accommodation and opposing disability discrimination and retaliation, including through his separate February 3

and February 5 reports.

**233.** Axsome had actual knowledge of Plaintiff's protected activity. Miu and Jacobson each knew of the protected activities preceding the acts attributed to that individual.

**234.** Miu personally participated by expressing the "lesson" reaction, acquiring direct knowledge of the disability complaint, interposing herself in the renewed request, and vehemently opposing Plaintiff's continued employment.

**235.** Jacobson personally participated by making or approving the denial, supplying disability-related reasons for it, and failing to respond to Plaintiff's direct renewed request.

**236.** Axsome denied continued employment, did not reconsider after the retaliation reports, and ended Plaintiff's active access before his stated separation date.

**237.** Those actions followed closely after the protected activities and would not have occurred absent Plaintiff's accommodation requests and opposition.

**238.** Miu and Jacobson directly participated in and aided and abetted Axsome's retaliation.

**239.** Plaintiff suffered economic and noneconomic injury.

## COUNT VIII

## DISABILITY RETALIATION

### Violation of N.Y.C. Administrative Code § 8-107(7)

### Against Defendants Axsome Therapeutics, Inc., Erica Miu, and Mark Jacobson

**240.** Plaintiff repeats and incorporates only ¶¶ 103–155.

**241.** Plaintiff requested reasonable accommodation and opposed disability discrimination and retaliation, including through his separate February 3 and February 5 reports.

**242.** Axsome had actual knowledge of Plaintiff's protected activity. Miu and Jacobson each knew of the protected activities preceding the acts attributed to that individual.

**243.** Miu's punitive reaction, conflicted participation, and vehement opposition to continued employment were reasonably likely to deter protected activity.

**244.** Jacobson's approval of the denial, failure to respond to the January 31 request, and reliance on Plaintiff's disclosed discomfort likewise constituted participation in the retaliatory course.

**245.** The February 6 lockout constituted further retaliation. Axsome's failure to reconsider after the February reports also supports an inference that it adopted and ratified the retaliatory result.

**246.** Plaintiff's protected activity played at least some role in those actions.

**247.** Miu and Jacobson are liable for their own conduct and, where applicable, for aiding and abetting Axsome.

**248.** Plaintiff suffered economic and noneconomic damages.

## COUNT IX

## RETALIATION FOR OPPOSING NATIONAL-ORIGIN DISCRIMINATION

## Title VII, 42 U.S.C. § 2000e-3(a)

## Against Defendant Axsome Therapeutics, Inc.

**249.** Plaintiff repeats and incorporates only ¶¶ 12, 52–56, 82–92, 95–98, 100, and 126.

**250.** Plaintiff reasonably believed that restricting a Nigerian employee's orientations and user-facing work because of his accent constituted unlawful national-origin discrimination.

**251.** Plaintiff opposed the restriction beginning in 2023, did not implement Miu's

August 14, 2024 categorical accent-based directive, and expressly renewed his opposition on December 10, 2024.

**252.** Miu knew that the employee continued performing user-facing work under Plaintiff, knew that Plaintiff had not implemented her August directive, and knew of Plaintiff's December 10 opposition.

**253.** After Plaintiff's opposition, Miu continued targeted scrutiny of the Nigerian employee, reduced Plaintiff's practical personnel and hiring authority, bypassed Plaintiff and Ferreira concerning work on a project Plaintiff had architected, and pursued another manager for the Operations function Plaintiff had been told he would lead.

**254.** On January 27, 2025, Axsome communicated to Plaintiff that the announced early-2025 Director promotion had been withdrawn.

**255.** The timing, Miu's knowledge, the correspondence between Plaintiff's protected managerial opposition and the personnel authority removed from him, the targeted scrutiny of the employee, and the displacement and withdrawal of the succession plan support causation.

**256.** But for Plaintiff's opposition to the accent-based restriction, Axsome would not have subjected him to one or more of the challenged adverse actions.

**257.** Plaintiff's EEOC Charge expressly identified the August and December accent-related incidents, Plaintiff's opposition, and the retaliation he alleged followed.

**258.** Plaintiff suffered economic and noneconomic damages.

## COUNT X

### RETALIATION FOR OPPOSING NATIONAL-ORIGIN DISCRIMINATION

### Violation of N.Y. Executive Law § 296(7)

### Against Defendants Axsome Therapeutics, Inc. and Erica Miu

**259.** Plaintiff repeats and incorporates only ¶¶ 52–56, 82–92, 95–98, 100, and 126.

**260.** Plaintiff opposed conduct he reasonably believed constituted national-origin discrimination against the Nigerian Support Engineer.

**261.** Axsome and Miu knew of Plaintiff's protected opposition.

**262.** Miu subsequently continued targeted scrutiny of the employee, reduced Plaintiff's practical personnel and hiring authority, bypassed Plaintiff and Ferreira concerning work on a project Plaintiff had architected, and pursued another manager for the Operations function.

**263.** On January 27, 2025, Axsome communicated to Plaintiff that the announced early-2025 Director promotion had been withdrawn.

**264.** Plaintiff's protected opposition was a but-for cause of one or more of those adverse actions.

**265.** Miu directly participated in and aided and abetted Axsome's retaliation.

**266.** Plaintiff suffered economic and noneconomic injury.

## COUNT XI

### RETALIATION FOR OPPOSING NATIONAL-ORIGIN DISCRIMINATION

### Violation of N.Y.C. Administrative Code § 8-107(7)

### Against Defendants Axsome Therapeutics, Inc. and Erica Miu

**267.** Plaintiff repeats and incorporates only ¶¶ 52–56, 82–92, 95–98, 100, and 126.

**268.** Plaintiff opposed an accent-based restriction that he reasonably believed violated the NYCHRL's prohibition against national-origin discrimination.

**269.** Axsome and Miu had actual knowledge of Plaintiff's opposition.

**270.** Miu's later targeted scrutiny of the employee, personnel interference, bypass of Plaintiff's reporting authority, and displacement of the succession plan were reasonably likely to deter a person from opposing discrimination.

**271.** Axsome's January 27 communication withdrawing the announced early-2025 Director promotion further constituted retaliatory conduct.

**272.** Plaintiff's protected opposition played at least some role in the challenged actions.

**273.** Miu is liable for her own conduct and, where applicable, for aiding and abetting Axsome.

**274.** Plaintiff was treated less well and suffered economic and noneconomic injury.

## VI. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests judgment in his favor and against Defendants as follows:

**A.** Declaring that the applicable Defendants violated the statutes identified in Counts I through XI;

**B.** Enjoining Defendants from continuing or repeating the unlawful practices alleged herein and awarding such other equitable relief as the Court deems appropriate;

**C.** Ordering Plaintiff's reinstatement to his former position or a substantially equivalent position with appropriate authority, seniority, compensation, and benefits, or awarding front pay in lieu of reinstatement;

**D.** Awarding back pay and all other lost compensation, including salary, bonuses, equity compensation, benefits, and other remuneration, to the extent recoverable;

**E.** Awarding compensatory damages, including damages for emotional distress and other noneconomic injury;

**F.** Awarding punitive damages under each statute that permits such relief;

**G.** Awarding the civil penalty authorized by N.Y. Labor Law § 740;

**H.** Awarding pre-judgment and post-judgment interest;

**I.** Awarding reasonable costs, disbursements, and attorneys' fees to the extent authorized by law, including fees incurred if counsel appears on Plaintiff's behalf;

**J.** Awarding such additional equitable, legal, or declaratory relief as the Court deems just and proper; and

**K.** Granting any further relief the Court determines appropriate.

## VII. DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims and issues triable by jury.

Dated: August 14, 2026

Respectfully submitted,

Suacer Marmolejos-Tejeda,
a/k/a Suacer Tejeda

Plaintiff, Pro Se

710 E 51st Street,

Brooklyn, NY, 11203

Telephone: (347) 458-7780

Email: suacer.tejeda@gmail.com

==================================================================

=================== *CERTIFICATE OF SERVICE* =====================

==================================================================

I hereby certify that on August 14, 2026, a true and correct copy of the foregoing FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL was served via electronic mail upon counsel of record for Defendants:

David Strand (dstrand@fisherphillips.com)

Jill Novak Dalrymple (jnovakdalrymple@fisherphillips.com)

/s/ Suacer Marmolejos-Tejeda

Suacer Marmolejos-Tejeda

Plaintiff Pro Se

Revised: October 23, 2025

# Model Certification Regarding Use of Artificial Intelligence in Filings

Case Name: **Marmolejos-Tejeda v. Axsome Therapeutics, Inc., et al.**

Case Number: **1:26-cv-01953-JPC-GS**

I, Suacer Marmolejos-Tejeda, certify that, with respect to the filing submitted in this case on August 14, 2026 and titled First Amended Complaint and Demand for Jury Trial, I used an artificial intelligence ("AI") tool in preparing the filing.

I further certify that:

☒ I personally reviewed the filing for accuracy.

☐ I did not personally review the filing for accuracy (failure to do so violates the Court's Rules).

2. If I reviewed the filing for accuracy, I took the following steps to verify the accuracy of all cited legal authorities and factual assertions generated by the AI tool:

I personally compared each factual allegation, date, quotation, and actor attribution with my recollection and available records comprised of underlying emails, messages, screenshots, performance-review materials, resume, presentations, and other source records in my possession. I checked each paragraph range incorporated into each Count; verified statutory text through official federal, New York State, and New York City sources; reviewed cited judicial decisions in the published opinions; and removed or revised any factual assertion or legal authority that I could not independently confirm.

I understand that I remain individually responsible for verifying the accuracy of any output produced by an AI tool, and that failure to comply with the Court's Rules may result in the filing being stricken and/or the imposition of sanctions.

Signed: [signature] Date: 8/14/26